ORIGINAL

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**Austin Division**

JAN  9 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

| | |
|---|---|
| GLENN ADAIR, Derivatively and on Behalf of Nominal Defendant Motive, Inc., | ) ) ) |
|     Plaintiff, | ) ) |
| v. | ) ) |
| SCOTT L. HARMON, PAUL M. BAKER, VIRGINIA GAMBALE, MICHAEL J. MAPLES, SR., TOM MEREDITH, DAVID SIKORA, HARVEY WHITE, ERIC L. JONES, MICHAEL LAVIGNA, and JOHN D. THORNTON, | ) ) ) ) ) ) ) |
|     Defendants, | ) ) |
| and | ) ) |
| MOTIVE, INC., | ) ) |
|     Nominal Defendant. | ) ) |

Case No.

**A06CA017 LY**

DEMAND FOR JURY TRIAL

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Glenn Adair ("Plaintiff"), derivatively and on behalf of Nominal Defendant

Motive, Inc. by and through his undersigned attorneys, and for his Complaint against

Defendants herein, alleges the following based upon personal knowledge of the Plaintiff,

and on information and belief as to all other matters, based upon, *inter alia*, the

investigation conducted by and through Plaintiff's attorneys, which included, among

other things, a review of the Defendants' public documents, public announcements

made by the Defendants, United States Securities and Exchange Commission ("SEC")

filings, wire and press releases published by and regarding Motive, Inc. (hereafter

"Motive" or the "Company") and information readily obtainable on the Internet. Plaintiff

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff and shareholders of Motive against certain current or former officers and directors of Motive seeking to remedy the Individual Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and negligence that occurred from June 25, 2004 through the present, (the "Relevant Period") and that have caused substantial losses to the Company. [1]

2.      During the Relevant Period, Motive projected third quarter 2005 revenues to be in the range of $24.5 million to $25.5 million.  Just two months later, however, the Company announced that third quarter revenues would be closer to $16.1 million, due to decreased demand for its product.  On this news, the price of the Company's common stock fell $4.45, a decrease of 36%.  Individual Defendants' previous guidance was false or misleading.  At the time such guidance was released Motive knew of the decreased demand for its product and that its news inflated revenue projection had no reasonable basis.  Additionally, on October 27, 2005, before the market opened, Motive announced its financial results for the quarters ended March 31, 2005 and June 30, 2005 and the six-month period ended June 30, 2005.  On this news the Company's share price fell an additional $0.41, a decline of more than 11%.

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between June 25, 2004 and October 27, 2005, the Relevant Period continues through this day instead of ceasing on October 26, 2005, the day before the public became aware of the wrongdoings at the Company.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Individual Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

4.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

5.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' participation in the wrongful acts detailed herein, occurred in this district, and Motive maintains its corporate headquarters in this District.  Further, Individual Defendants either reside in or maintain executive offices in this district, and/or have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

6.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7.     Plaintiff, Glenn Adair, as set forth in the accompanying Verification, is, and was during the Relevant Period, a shareholder of Motive.  Plaintiff is a resident of the State of Ohio.

8.     Nominal Defendant Motive is a corporation organized under the laws of the State of Delaware with its principal executive offices located at 12515 Research

Boulevard, Building 5, Austin, Texas.  Motive describes itself as a leading provider of management software for networked products and services.

9.      Defendant Scott L. Harmon ("Harmon") is a resident of the State of Texas. He served, at all relevant times, as Motive's Chief Executive Officer and the Chairman of its Board of Directors.  Harmon is one of the signatories of the false and misleading Registration Statement.

10.     Defendant Paul M. Baker ("Baker") is a resident of the State of Texas.  He served, at all relevant times, as Motive's Chief Financial Officer since February, 2000. Baker is one of the signatories of the false and misleading Registration Statement.

11.     Defendant Virginia Gambale ("Gambale") is believed to be a resident of the State of Rhode Island.  She served, at all relevant times, as a member of Motive's Board of Directors.

12.     Defendant Michael J. Maples, Sr. ("Maples") is believed to be a resident of the State of Texas.  He served, at all relevant times, as a member of Motive's Board of Directors.  Maples is one of the signatories of the false and misleading Registration Statement.

13.     Defendant Tom Meredith ("Meredith") is believed to be a resident of the State of Texas.  He served, at all relevant times, as a member of Motive's Board of Directors.  Meredith is one of the signatories of the false and misleading Registration Statement.

14.     Defendant David Sikora ("Sikora") is believed to be a resident of the State of Texas.  He served, at all relevant times, as a member of Motive's Board of Directors. Sikora is one of the signatories of the false and misleading Registration Statement.

4

15.     Defendant Harvey White ("White") is believed to be a resident of the State of California.  He served, at all relevant times, as a member of Motive's Board of Directors.

16.     Defendant Eric L. Jones ("Jones") is a resident of the State of Texas.  He is a former director of the Company.  Jones is one of the signatories of the false and misleading Registration Statement.

17.     Defendant Michael LaVigna ("LaVigna") is a resident of the State of Texas.  He is a former director of the Company.  LaVigna is one of the signatories of the false and misleading Registration Statement.

18.     Defendant John D. Thornton ("Thornton") is a resident of the State of Texas.  He is a former director of the Company.  Thornton is one of the signatories of the false and misleading Registration Statement.

19.     Defendants Harmon, Baker, Gambale, Maples, Meredith, Sikora, White, Jones, LaVigna and Thornton will sometimes be referred to hereinafter collectively as the "Individual Defendants."

20.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and

5

committees thereof and via reports and other information provided to them in connection therewith.

21.     Each of the above officers of Motive, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.   Said Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act; and is traded on NASDAQ; and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

23.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Motive, each of the Individual Defendants had access to the adverse undisclosed information about Motive's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Motive and its business issued or adopted by the Company materially false and misleading.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

25.     Motive describes itself as a leading provider of management software for networked products and services.  The Company claims that products and services with built-in Motive management capabilities are more self-managing – able to self-diagnose,

self-repair, self-monitor, self-upgrade, and self-regulate, as well guide as individuals through simple management steps when necessary.

26.    The Company's IPO was extremely difficult to complete.   On July 13, 2000, the Company filed its Registration Statement with the SEC.   With the subsequent market downturn for Internet/software companies, the public's interest in Motive's IPO waned, and so the Company's Registration Statement was withdrawn in the Spring of 2001.  In the Winter of 2003/2004, the Company made another attempt at an IPO.  With the Company in trouble (unbeknownst to prospective investors), Individual Defendants needed to bring the Company public.  Individual Defendants needed to raise $50 million to keep the Company afloat and provide a vehicle to monetize their own holdings.  In order to do this, they would need to misstate and/or omit material information to generate this level of interest.  In late June 2004, almost six months after filing the second Registration Statement, Individual Defendants were able to generate enough public interest to bring the Company public.

27.    In order to generate sufficient public interest, the Individual Defendants were forced to enter an agreement whereby they were contractually forbidden from selling any of their shares until December 21, 2004 (the "Lock-up").  To ensure that the price of Motive stock remained inflated until the Lock-up expired and the Individual Defendants were able to dump their shares, Individual Defendants utilized various accounting manipulations and caused to be disseminated to the markets, earnings estimates that lacked any reasonable basis in fact.  For example, in Spring 2005, the Company sold a license to an existing Company client (a reseller) and concurrently recognized $5.2 million in revenue for the license sale. Recognition of revenue from the

sale was highly improper and violated the basic tenets of Generally Accepted Accounting Principles ("GAAP"). Not only did the reseller never pay the Company $5.2 million for the sale, the Individual Defendants actually knew (at the time of the sale) that the Company might never actually receive the recorded $5.2 million. In fact, Individual Defendants and the reseller had entered into a tacit contingent agreement with the reseller which only required the reseller to pay Motive if and when the reseller sublicensed (sold) Motive's product to a third party and recouped $5.2 million in the process. In fact, over the prior two-and-a-half years, the Company and the reseller had similar tacit contingent agreements as to many other transactions which permitted Motive to prematurely recognize revenue, thereby inflating the perceived value of the Company. Motive continued to improperly record revenue from these contingent transactions in order to appear to have strong results. This illegal revenue recognition practice continued each quarter post-IPO, but was most exploited immediately after the expiration of the Lock-up in order to make Individual Defendants' insider sales more lucrative. The Company partially disclosed its improper contingent sales in late October 2005, together with the fact that similar types of reseller contingent transactions contributed at least $3.8 million in revenues to Motive in 2004.

28.     Contingent transactions constituted only a portion of the fraud. At the time of the IPO, the Company was suffering from adverse business trends which were dramatically restructuring the way in which the Company was being paid. Broadband providers were demanding more of a pay-as-you-go contract instead of the typical three-year contracts that Motive historically structured. Customers were paying less up front and asking for terms as short as 9-12 months. For example, despite six new

transactions in the Company's most recent quarter, revenue that could be recognized from new carrier deals was minimal.

29.     Individual Defendants completed Motive's IPO on June 24, 2004, pursuant to a false Registration Statement/Prospectus which failed to disclose the truth concerning its revenue recognition practices. With respect to the Company's Revenue Recognition, the Registration Statement stated:

### Revenue Recognition

License fees revenue is comprised of fees for term and, to a lesser extent, perpetual licenses of our software. To date, we have not entered into any software arrangement solely for the license of products and, therefore, we have not demonstrated vendor specific objective evidence ("VSOE") of fair value for the license element. We (1) recognize revenue for the fees associated with a perpetual license or a term license with VSOE for maintenance using the residual method in accordance with Statement of Position ("SOP") 98-9, *Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions*, regardless of any separate prices stated within the contract for each element, or (2) recognize revenue for the fees associated with a term license without VSOE for maintenance ratably over the term of the agreement, generally one to three years. Prior to the fourth quarter of 2001, we did not have VSOE to determine the fair value of maintenance for term licenses. As a result, license fees revenue also includes maintenance for term licenses entered into prior to the establishment of VSOE of maintenance for term licenses. License fees revenue is recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, no unfulfilled vendor obligations remain, the fee is fixed or determinable and collectibility is probable.

If the fee for the license has any payment terms that are in excess of our normal payment terms, the fee is considered not to be fixed or determinable. In this scenario, the amount of revenue recognized for perpetual license arrangements and term license arrangements *with* VSOE for maintenance is limited to the amount currently due from the customer. In such arrangements, license fees are recognized as license fees revenue as the related amounts become due. Because each such arrangement is individually negotiated, the payment schedule and resulting revenue recognition associated with each agreement can vary. The amount of revenue recognized for term license arrangements *without* VSOE for maintenance is limited to the lesser of the amount due from the customer during each reporting period and a ratable portion of the total

unallocated arrangement fee. In most cases, this means that both license fees and maintenance associated with the underlying arrangement are recognized as license fees revenue ratably over the term of the contract, which generally tends to defer revenue recognition over longer periods of time. To the extent that sufficient amounts are not due from the customer to cover the ratable revenue recognition for an applicable period, the amount of revenue recognized is limited to the amount currently due.

If an arrangement includes a right of acceptance or a right to cancel, revenue is recognized when acceptance is received or the right to cancel has expired.

License fees revenue from arrangements with resellers involving nonrefundable fixed minimum license fees are recognized when payment becomes due from the customer and delivery of the product has occurred, assuming no significant unfulfilled vendor obligations remain. Royalties related to such reseller arrangements in excess of the fixed minimum amounts are recognized as revenue when such amounts are reported to us.

30.     With respect to the Company's valuation of doubtful accounts, the

Registration Statement stated, in part:

### *Allowance for Doubtful Accounts*

We continuously assess the collectibility of outstanding customer invoices and in doing so, we maintain an allowance for estimated losses resulting from the non-collection of customer receivables. In estimating this allowance, we consider factors such as: historical collection experience; a customer's current credit worthiness; customer concentration; age of the receivable balance, both individually and in the aggregate; and general economic conditions that may affect a customer's ability to pay. Actual customer collections could differ from our estimates and accordingly could exceed our related loss allowance.

31.     Following the close of the market, on June 24, 2004, *Bloomberg* published

an article entitled "Motive, Software Company, Raises $50 Mln in Initial Offering," which

stated in part that Motive had raised $50 million in an IPO to pay debt and fund its

business by selling 5 million shares at $10 each, compared with a price tag of $11 to

$14 a share indicated in an SEC filing.

32.    On July 21, 2004, the Company issued a press release entitled "Motive, Inc. Reports Second Quarter Financial Results; Core revenue of $22.0 million – 30% increase from 2Q 2003."  The release stated:

> Motive, Inc. (NASDAQ: MOTV), a provider of management software that enables technology products to manage themselves, today announced results for the quarter ended June 30, 2004. Motive's core revenue, which excludes revenue acquired in business combination, was $22.0 million for the second quarter of 2004, a 30% increase over the same period in 2003 and a 14% increase over the first quarter of 2004. Motive's total revenue for the second quarter of 2004 was $24.0 million.
>
> Motive's pro forma net income for the second quarter of 2004 was $798,000 or $0.04 per diluted share, compared to $257,000 or $0.01 per diluted share for the same period in 2003, and $617,000 or $0.03 per diluted share for the first quarter of 2004. Motive's GAAP net loss for the second quarter of 2004 was $2.1 million or ($0.20) per basic share. A reconciliation of GAAP to pro forma results has been provided in the financial statement tables included in this press release.
>
> **"Motive's second quarter results reflect the demand in the market for a new type of software that applies service-centric management to leading-edge Internet technologies being widely adopted in homes, small business and enterprises," said Scott Harmon, CEO of Motive. "We are very pleased to see the investments we've made in new products and market opportunities paying off."**
>
> **"Our terrific execution allowed us to outperform our revenue and profit targets in the second quarter," said Logan Wray, COO of Motive. "Looking ahead, we are excited about our prospects for continued growth and solid results as we continue to apply our model in new segments and geographies."**
>
> *      *      *
>
> **Financial Outlook**
>
> **Core revenue is expected to be in the range of $22.4 million to $22.7 million for the third quarter of 2004 and in the range of $95 million to $97 million for the 12 months ending June 30, 2005. Pro forma earnings are expected to be $0.04 per diluted share for the third quarter of 2004.**
>
> (Emphasis added.)

33.    On October 20, 2004, the Company issued a release reporting Motive's "record" Q3 2004 financial results.  The release stated:

- **License revenue exceeds consensus analyst estimates, drives core revenue growth of 51% over prior year**

- **Pro forma earnings of $0.05 per diluted share exceed consensus analyst estimates; GAAP earnings of $0.06 per diluted share**

  …Motive, Inc. (NASDAQ: MOTV), a leading provider of management software, today announced results for the quarter ended September 30, 2004. Core revenue, which excludes services revenue acquired in business combination, was $23.0 million for the third quarter of 2004, a 51 percent increase over the same period in 2003. Motive's total revenue for the third quarter of 2004 was $24.5 million, a 23 percent increase over the same period in 2003.

34.    On December 21, 2004, the Lock-up expired, allowing Individual Defendants to sell their own personal Motive holdings.    Individual Defendants immediately began to take advantage of the expiration by selling Motive shares into the market at prices inflated by the false statements.    In all, Individual Defendants sold 102,000 shares and pocketed in excess of $962,000 before their scheme unraveled.

35.    On January 25, 2005, the Company issued a release entitled "Motive, Inc. Reports Record Earnings for Fourth Quarter and Fiscal Year 2004."  The release stated:

- **Exceeded fourth quarter consensus estimates for both core and total revenue**

- **Fourth quarter pro forma earnings of $0.10 per diluted share also exceeded consensus estimates; GAAP earnings of $0.09 per diluted share**

  **AUSTIN, Texas, Jan. 25, 2005** - Motive, Inc. (NASDAQ: MOTV), a leading provider of management software, today announced results for the fourth quarter and fiscal year 2004. Core revenue for the fourth quarter of 2004, which excludes services revenue acquired in business combination, was a record $25.3 million, a 12 percent increase over the fourth quarter of 2003. Motive's total revenue for the fourth quarter of 2004 was $26.8

million. Core revenue for 2004 was $89.6 million, a 33 percent increase over 2003. Total revenue for 2004 was $98.0 million.

Motive's pro forma net income for the fourth quarter of 2004 was $2.7 million or $0.10 per diluted share, compared to $1.9 million or $0.09 per diluted share for the fourth quarter of 2003. Motive's GAAP net income for the fourth quarter of 2004 was $2.5 million or $0.09 per diluted share compared to $1.0 million or $0.05 per diluted share for the fourth quarter of 2003. Motive's pro forma net income for 2004 was $5.5 million or $0.22 per diluted share, compared to $3.9 million or $0.19 per diluted share for 2003. Motive's GAAP net income for 2004 was $0.4 million or $0.02 per diluted share, compared to a net loss of $1.2 million or $0.12 per diluted share for 2003.

A reconciliation of GAAP to pro forma results has been provided in the financial statement tables included in this press release.

**"This quarter's results have made a significant contribution to a record year for Motive," said Scott Harmon, CEO of Motive, Inc. "We exceeded expectations of our business, particularly with respect to growth, where focused execution translated into expanded market opportunities and strategic, long-term relationships with some of the world's leading technology service providers. We are entering 2005 with a strong position, selling into a market that we believe holds significant opportunity."**

**"Once again this quarter we delivered excellent results at both the top and bottom lines based on our ability to up-sell to existing customers and penetrate new and emerging markets with highly targeted product offerings," said Logan Wray, COO of Motive, Inc. "Given the momentum we're seeing in the service provider market, the growing demand among enterprise companies, and our continued product innovation, we are well-positioned to build on our success into 2005."**

**In 2004, Motive had significant growth in the number of companies using its management software to build intelligent automation directly into a new generation of smart service-oriented networks. These now include 34 broadband service providers, nine of which are in the top 16 in North America, EMEA and Japan; two of the top CRM providers; and a leading application server provider. As a result, Motive's software is now built into more than 200 broadband and corporate enterprise services, and has been used to manage more than 40 million end points worldwide.**

(Emphasis added.)

14

36.    On April 21, 2005, the Company issued a press release entitled "Alcatel and Motive Join Forces to Meet Triple Play Digital Home Management Challenge," which stated in part::

> "The advancement of broadband technology provides tremendous new opportunities for service providers seeking to grow and expand their business in a highly competitive climate," said Scott Harmon, CEO at Motive, Inc. "Our relationship with Alcatel will help operators worldwide implement Triple Play strategies that bring new information, communication and entertainment services to consumers, enabled by the combination of powerful broadband network solutions and customer service management technologies."

37.    On April 21. 2005, the Company issued a release announcing its Q1 2005 earnings.  The release stated:

> - **License revenue of $14.1 million reflects 22 percent growth over prior year**
>
> - **First quarter pro forma earnings of $0.05 per diluted share exceeds consensus estimates; GAAP earnings of $0.02 per diluted share**
>
> **AUSTIN, Texas, April 21, 2005 -** Motive, Inc. (NASDAQ: MOTV), a leading provider of management software, today announced results for the first quarter ended March 31, 2005. Core revenue, which excludes impact from business acquisitions, was $23.3 million, a 21 percent increase over the first quarter of 2004. Total revenue for the first quarter of 2005 was $24.6 million.
>
> Motive's pro forma net income for the first quarter of 2005 was $1.5 million or $0.05 per diluted share, beating consensus estimates by a penny. Motive's GAAP net income for the first quarter of 2005 was $600,000 or $0.02 per diluted share, compared to a loss of $1.6 million or $0.16 per diluted share for the first quarter of 2004. A reconciliation of GAAP to pro forma results has been provided in the financial statement tables included in this press release.
>
> **"For the fourth consecutive quarter, our results have met or exceeded expectations. We believe this demonstrates that we are in the right markets with the right products at the right time," said Scott Harmon, CEO of Motive. "The need for our management automation software remains strong as companies continue to invest heavily in the delivery of sophisticated networked products and services to mainstream enterprise and consumer customers."**
>
> **"The rigor and discipline we put into developing arguably the industry's most full-featured product set continues to pay-off and provide the business leverage we planned," said Logan Wray, COO of Motive. "We believe this is one of the primary reasons we have been able to garner almost twice the number of customers as our nearest competitor."**
>
> (Emphasis added.)

38.     On June 12, 2005, the Company's Vice President of Worldwide Sales, who shared the responsibility for the questionable $5.8 million sale, resigned from his position long before the details of the sale were revealed to the public.  While Individual Defendants knew this event was highly material to the Company's past and future, the Company buried this fact in a Form 8-K filed with the SEC.

39.     On July 11, 2005, Motive announced its preliminary second quarter results for the quarter ended June 30, 2005.  In its press release announcing the preliminary second quarter results, defendant Harmon stated as follows:

> "Although this quarter we added several new customers and renewed and extended relationships with a number of existing customers, we had a significant transaction push out past the end of the quarter and our consulting services revenue fell short of our estimates.... While we are disappointed with our expected second quarter financial results, **we do not believe they are indicative of a decline in the need for our management automation software.**"

(Emphasis added.)

40.     On July 27, 2005, Motive issued a press release entitled "Motive, Inc. Announces Second Quarter Results."   The press release affirmatively announced financial results for the second quarter ended June 30, 2005 of pro forma net income of $0.3 million or $0.01 per diluted share as compared to $0.8 million or $0.04 per diluted share for the second quarter of 2004, and GAAP net loss for the second quarter of 2005 of $1.8 million or ($0.07) per share, compared to a net loss of $2.1 million or ($0.20) per share for the second quarter of 2004.  In this press release, Defendant Harmon was quoted as saying:

> "**I am confident in the strength of our markets,** particularly as broadband providers continue to invest heavily in the roll-out of advanced services. In addition, I am excited by the increasing role for Motive's software in addressing the complexity of new enterprise applications.... I

> **believe that our management software products are well-positioned to take advantage of these opportunities in both the near- and long-term."**

The press release further stated:

> Core revenue for the third quarter of 2005 is expected to be in the range of $23.5 million to $24.5 million, and total revenue is expected to be in the range of $24.5 million to $25.5 million. Core revenue for the fiscal year 2005 is expected to be in the range of $95.5 million to $97.5 million, and total revenue is expected to be in the range of $99.5 million to $101.5 million. **Pro forma earnings are expected to be in the range of $0.05 to $0.06 per diluted share for the third quarter of 2005 and in the range of $0.21 to $0.24 per diluted share for fiscal year 2005.**

(Emphasis added.)

    41.    On October 4, 2005, Motive issued a press release entitled "Motive, Inc. Announces Preliminary Third Quarter Results" in which the expected quarterly and year-end results announced in the July 27, 2005 press release were revised to anticipate a loss for the quarter. The press release stated as follows:

> Motive, Inc. (NASDAQ: MOTV), a leading provider of management software, today announced preliminary results for the third quarter ended September 30, 2005. The company expects core revenue for the third quarter of 2005, which excludes impact from business acquisitions, to be in the range of $15.5 million to $17.5 million, compared to core revenue of $23 million for the same period last year. Total revenue for the third quarter of 2005 is expected to be in the range of $16.5 million to $18.5 million.
>
> **Motive's pro forma loss per share for the third quarter of 2005 is expected to be in the range of ($0.12) to ($0.17) per diluted share, compared to pro forma earnings per share of $0.05 per diluted share for the same period last year. Motive's GAAP loss per share for the third quarter of 2005 is expected to be in the range of ($0.20) to ($0.27) per diluted share.** Pro forma earnings and loss per share exclude (i) the amortization of acquired technology, intangibles and deferred stock compensation and (ii) receipt of cash associated with a legal settlement, and assume a pro forma effective tax rate of 35 percent.
>
> **"These results have led us to make significant changes in two key areas,"** said Scott Harmon, CEO of Motive. **"First, with regard to our enterprise business, we have decided that the investment necessary**

**for Motive to cultivate relationships with Global 2000 enterprises is greater than we can sustain, and we are reviewing strategic options for this business. As a result, we will focus on our core strength in the communications market which will drive the company's future strategic direction and success. Second, we are taking immediate steps to bring our cost structure in line with our new business requirements."**

Harmon added: "Most importantly, I believe that the changes we are making will allow us to focus 100 percent on growing our leadership position in the communications market and expanding our relationships with the world's leading telecommunications and cable broadband companies."

**"Given the anticipated changes to our business, we no longer expect to achieve the revenue and EPS guidance that we previously released for the remainder of 2005,"** said Paul Baker, CFO of Motive.

(Emphasis added.)

42.     On this news, the price of the Company's stock fell from $6.26 to $4.01 at

the close of trading on October 5, 2005, a decline of 36%.

43.     Before the market opened on October 27, 2005, Motive issued a press

release entitled "Motive, Inc. Announces Third Quarter Results and Restatement of

Results for Prior Two Quarters."  The press release stated as follows:

Motive, Inc. (NASDAQ: MOTV), a leading provider of management software, today announced financial results for the quarter ended September 30, 2005, **as well as the decision to restate its financial results for the quarters ended March 31, 2005 and June 30, 2005 and the six-month period ended June 30, 2005. As a result, the financial statements previously issued by Motive for these periods should no longer be relied upon.**

\*        \*        \*

During the first quarter of 2005, Motive signed a new license agreement with one of its European resellers. The agreement provided for the reseller to pay Motive a total of $5.8 million in maintenance and license fees, and gave the reseller the right to sublicense certain Motive software to a leading European broadband provider. Motive has had a relationship with this reseller for the last three years, during which the reseller has successfully completed several large transactions to provide Motive

software to multiple broadband providers. The provider referenced in the reseller agreement has used Motive software for more than two years.

As of Oct. 26, 2005, the reseller had not paid $5.2 million, which was the initial payment invoiced upon execution of the agreement with 90-day payment terms. Although the agreement provides that the reseller's obligation to pay fees to Motive is not contingent upon the reseller sublicensing the Motive software, **Motive now believes that the collection of the receivable is dependent upon the reseller sublicensing the software to its customer. Since this condition does not meet Motive's revenue recognition policy requirements, Motive decided on Oct. 26, 2005 to restate its financial results for the three-month periods ended March 31, 2005 and June 30, 2005, and the six-month period ended June 30, 2005, and will not reflect any revenue from this arrangement in the nine months ended Sept. 30, 2005.** Motive will recognize revenue from this arrangement when Motive's revenue recognition criteria are met.

Motive will amend its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2005 and June 30, 2005 to reflect the restatement described above. The financial statement tables attached to this press release include the expected adjustments from this restatement. None of the adjustments resulting from the restatements has any impact on cash balances for any period.

44.    Following the October 27, 2005 announcement, the price of Motive's common stock that same day fell more than 11% from $4.12 per share to $3.66 per share on extremely heavy volume.

45.    Subsequently, on November 14, 2005, Motive filed a Form 8-K with the SEC which announced that the Company would be unable to timely file its Form 10-Q for the quarter ended September 30, 2005, announced that the Company was conducting a review of its revenue recognition and disclosed that the SEC was conducting an informal inquiry related to the restatement.  The Form 10-Q stated as follows:

Motive, Inc (the "Company") will not file its quarterly report on Form 10-Q for the quarter ended September 30, 2005 within the time period prescribed for such report.

**The Audit Committee of the Company's Board of Directors is conducting a review of the Company's revenue recognition related to certain reseller transactions, and intends to engage external counsel and other advisors to assist in such review.** The Company anticipates that it will file its quarterly report on Form 10-Q for the quarter ended September 30, 2005, and the previously announced amendments to its quarterly reports on Form 10-Q for the quarters ended March 31, 2005 and June 30, 2005, upon the completion of the Audit Committee's review. Additionally, the Company has filed a notice on Form 12b-25 with the Securities and Exchange Commission.

The total amount of revenue recognized by the Company from reseller arrangements was $4.2 million in the 2004 calendar year, and $2.4 million in the nine-month period ended September 30, 2005 (after application of the Company's previously announced decision to eliminate revenue previously recognized from a reseller arrangement entered into in the quarter ended March 31, 2005).

**In addition, the Company has been informed that the Division of Enforcement of the United States Securities and Exchange Commission is conducting an informal inquiry into Motive.** The Company believes that the inquiry relates to the recent restatement of its financial results and certain executive stock sales. The Company is cooperating with the inquiry. The SEC has advised the Company that the inquiry should not be construed as either an indication by the SEC that any violations of law have occurred, or as an adverse reflection upon any person, entity or security.

46.     The statements made in ¶¶ 25, 40, and 41 were materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to the Individual Defendants or recklessly disregarded by them: (1) that there was a decline in the demand for Motive's management automation software such that Motive has now admitted that it needs to focus on the communications market instead of cultivating relationships with Global 2000 enterprises; (2) that Motive knew that it could not realize revenues of $24.5 million to $25.5 million for the third quarter of 2005; and (3) that its financial results for the quarters ended March 31, 2005 and June 30, 2005 were not prepared and presented in accordance with GAAP.

47.    The true facts, which were known to Individual Defendants based upon their access to and/or review of internal Motive corporate data during the Relevant Period, including, but not limited to:

(a)    That for a period of nearly three years (2002-2005) the Company's finance/accounting departments lacked requisite internal controls necessary to make accurate financial reports and  projections;

(b)    That for a period of at least three years, the Company had been engaging in improper contingent sales with one of its key customers;

(c)    That demand for the Company's core activation and self service offerings had waned severely and could not contribute to the stellar growth Individual Defendants had claimed and projected;

(d)    That the "push-out" of new broadband services early on had terminated any basis for Individual Defendants even hoping for the growth they were repeatedly projecting;

(e)    That unlike most software companies, the Company was using an extremely aggressive accounting practice which allowed Individual Defendants to manipulate revenue and earnings for multiple quarters;

(f)    That for a significant amount of Individual Defendants' revenue, collection of such revenue was contingent upon the resale (and/or sublicense) of those licenses to third parties;

(g)    That the Company's customers either could not or would not purchase the Company's licenses, absent resale of licenses.  The Company used desperate measures to inflate the Company's income and revenue by selling millions

of dollars worth of licenses to customers who could not pay or would not pay until they recouped the purchase price from resales;

(h)    That the Company's ability to report profit versus losses in Q1-Q2 2005 was dependent upon one transaction (with an approximate value of $5.8 million) and contingent upon a European broadband provider's ability to sublicense the Company's products;

(i)    That as a direct and proximate result of (a)-(h) above, the Company's projections for FY 2005 were materially false and misleading, as Individual Defendants had no reasonable basis to believe, and did not actually believe, that the Company's reported results were accurate and that, absent fraud, the Company's projections were unattainable; and

(j)    That as a direct proximate result of (a)-(h) above, the Company's reported financial results were misleading in violation of GAAP.

48.    In fact, Motive's financials had been false for nearly one year due to its improper revenue recognition practice.  As a result, Motive's results were presented in violation of GAAP.

49.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Regulations S-X, 17 C.F.R. §210.4-01(a)(1) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim

financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.

50.     In fact, contrary to Motive's representations in its SEC filings about revenue recognition, the Company dies not consistently require that collectibility be probable prior to recognition.

51.     Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatements and revisions announced by Motive were to correct for material errors in previously issued financial statements.  APB No. 20, ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.  *Id.* ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.   Motive's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatements and revisions were an admission by Individual Defendants that Motive's previously issued financial results and its public statements regarding those results were false and misleading.  Moreover, immaterial corrections are not required to be restated.  APB No. 20 ¶38.  Thus, the restatement indicates that the errors were material.

**INSIDER TRADING**

52.    In addition to the above-described involvement, each Individual Defendant had knowledge of Motive's problems and was motivated to conceal such problems. Each Defendant is liable for: (i) making false statements, or (ii) failing to disclose adverse facts known to it or him about Motive.

53.    Individual Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Motive stock was a success, as it: (i) deceived the investing public regarding Motive's prospects and business; and (ii) artificially inflated the price of Motive's common stock.

54.    Defendants Harmon and Sikora were motivated to commit the wrongdoing alleged herein in order to sell Motive stock at artificially inflated prices. Harmon's stock was held by SLH Holdings, Ltd., of which Defendant Harmon is the general partner. During the Relevant Period, Defendant Harmon sold a total of **32,000** shares of Motive common stock at artificially inflated prices, for proceeds of **$286,688,** and Defendant Sikora sold a total of 70,000 shares of Motive common stock at artificially inflated prices, for proceeds of 675,850, as particularized in the following table:

**Scott L. Harmon: CEO**

| Transaction Date | Number of Shares | $ Price | $ Value |
|---|---|---|---|
| 06/15/2005 | 4,000 | $9.5000 | $38,000.00 |
| 06/20/2005 | 1,300 | 9.5131 | 12,367.03 |
| 06/20/2005 | 658 | 9.5200 | 6,264.16 |
| 06/20/2005 | 100 | 9.5300 | 953.00 |
| 06/20/2005 | 800 | 9.5475 | 7,638.00 |
| 06/20/2005 | 400 | 9.5500 | 3,820.00 |
| 06/20/2005 | 742 | 9.6000 | 7,123.20 |
| 06/21/2005 | 2,700 | 9.5000 | 25,650.00 |
| 06/21/2005 | 1,300 | 9.5769 | 12,449.97 |
| 06/28/2005 | 100 | 10.1300 | 1,013.00 |
| 06/28/2005 | 106 | 10.1600 | 1,076.96 |
| 06/28/2005 | 200 | 10.1900 | 2,038.00 |

| | | | |
|---|---|---|---|
| 06/28/2005 | 100 | 10.2100 | 1,021.00 |
| 06/28/2005 | 300 | 10.2200 | 3,066.00 |
| 06/28/2005 | 300 | 10.2300 | 3,069.00 |
| 06/28/2005 | 200 | 10.2400 | 2,048.00 |
| 06/28/2005 | 100 | 10.2500 | 1,025.00 |
| 06/28/2005 | 200 | 10.2600 | 2,052.00 |
| 06/28/2005 | 200 | 10.2700 | 2,054.00 |
| 06/28/2005 | 300 | 10.2800 | 3,084.00 |
| 06/28/2005 | 200 | 10.2900 | 2,058.00 |
| 06/28/2005 | 25 | 10.3000 | 257.50 |
| 06/28/2005 | 100 | 10.3300 | 1,033.00 |
| 06/28/2005 | 1,369 | 10.3700 | 14,196.53 |
| 06/28/2005 | 200 | 10.3800 | 2,076.00 |
| 06/29/2005 | 28 | 10.2600 | 287.28 |
| 06/29/2005 | 200 | 10.2700 | 2,054.00 |
| 06/29/2005 | 311 | 10.2800 | 3,197.08 |
| 06/29/2005 | 700 | 10.2900 | 7,203.00 |
| 06/29/2005 | 100 | 10.3000 | 1,030.00 |
| 06/29/2005 | 100 | 10.3200 | 1,032.00 |
| 06/29/2005 | 300 | 10.3300 | 3,099.00 |
| 06/29/2005 | 100 | 10.3400 | 1,034.00 |
| 06/29/2005 | 200 | 10.3800 | 2,076.00 |
| 06/29/2005 | 100 | 10.3900 | 1,039.00 |
| 06/29/2005 | 100 | 10.4000 | 1,040.00 |
| 06/29/2005 | 300 | 10.4200 | 3,126.00 |
| 06/29/2005 | 100 | 10.4300 | 1,043.00 |
| 06/29/2005 | 700 | 10.4400 | 7,308.00 |
| 06/29/2005 | 200 | 10.4500 | 2,090.00 |
| 06/29/2005 | 161 | 10.4600 | 1,684.06 |
| 06/29/2005 | 200 | 10.4800 | 2,096.00 |
| 06/29/2005 | 100 | 10.5300 | 1,053.00 |
| 07/05/2005 | 600 | 10.0000 | 6,000.00 |
| 07/05/2005 | 400 | 10.0100 | 4,004.00 |
| 07/05/2005 | 300 | 10.0200 | 3,006.00 |
| 07/05/2005 | 200 | 10.0300 | 2,006.00 |
| 07/05/2005 | 400 | 10.0400 | 4,016.00 |
| 07/05/2005 | 300 | 10.0500 | 3,015.00 |
| 07/05/2005 | 200 | 10.0550 | 2,011.00 |
| 07/05/2005 | 200 | 10.0650 | 2,013.00 |
| 07/05/2005 | 200 | 10.0800 | 2,016.00 |
| 07/05/2005 | 200 | 10.0850 | 2,017.00 |
| 07/05/2005 | 300 | 10.0900 | 3,027.00 |
| 07/05/2005 | 200 | 10.1000 | 2,020.00 |
| 07/05/2005 | 200 | 10.1050 | 2,021.00 |

| | | | |
|---|---|---|---|
| 07/05/2005 | 100 | 10.1100 | 1,011.00 |
| 07/05/2005 | 100 | 9.9600 | 996.00 |
| 07/05/2005 | 100 | 9.9900 | 999.00 |
| 10/03/2005 | 3,700 | 6.1649 | 22,810.13 |
| 10/03/2005 | 100 | 6.2100 | 621.00 |
| 10/03/2005 | 200 | 6.2050 | 1,241.00 |
| 10/04/2005 | 100 | 6.1400 | 614.00 |
| 10/04/2005 | 300 | 6.1500 | 1,845.00 |
| 10/04/2005 | 37 | 6.1700 | 228.29 |
| 10/04/2005 | 100 | 6.1800 | 618.00 |
| 10/04/2005 | 200 | 6.1900 | 1,238.00 |
| 10/04/2005 | 600 | 6.2000 | 3,720.00 |
| 10/04/2005 | 200 | 6.2100 | 1,242.00 |
| 10/04/2005 | 200 | 6.2300 | 1,246.00 |
| 10/04/2005 | 200 | 6.2400 | 1,248.00 |
| 10/04/2005 | 200 | 6.2450 | 1,249.00 |
| 10/04/2005 | 213 | 6.2500 | 1,331.25 |
| 10/04/2005 | 200 | 6.2550 | 1,251.00 |
| 10/04/2005 | 950 | 6.2600 | 5,947.00 |
| 10/04/2005 | 400 | 6.2700 | 2,508.00 |
| 10/04/2005 | 100 | 6.2800 | 628.00 |
| **TOTAL** | **32,000** | | **$286,688.44** |

**David Sikora: Director**

| | | | |
|---|---|---|---|
| 04/22/2005 | 10,000 | $9.5500 | $95,500.00 |
| 04/22/2005 | 10,000 | 9.8000 | 98,000.00 |
| 04/22/2005 | 5,000 | 9.1000 | 45,500.00 |
| 04/25/2005 | 5,000 | 9.2600 | 46,300.00 |
| 04/25/2005 | 5,000 | 9.3000 | 46,500.00 |
| 04/26/2005 | 5,000 | 9.3500 | 46,750.00 |
| 06/15/2005 | 10,000 | 9.4500 | 94,500.00 |
| 06/22/2005 | 10,000 | 10.0500 | 100,500.00 |
| 06/22/2005 | 2,000 | 10.1500 | 20,300.00 |
| 06/23/2005 | 8,000 | 10.2500 | 82,000.00 |
| **TOTAL** | **70,000** | | **$675,850.00** |

| | | | |
|---|---|---|---|
| **GRAND TOTAL** | **102,000** | | **$962,538.44** |

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

34.     Plaintiff brings this action derivatively in the right and for the benefit of Motive to redress injuries suffered and to be suffered by Motive as a result of the breaches of fiduciary duty by the Individual Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

35.     Plaintiff will adequately and fairly represent the interests of Motive and its shareholders in enforcing and prosecuting its rights.

36.     Plaintiff is an owner of Motive common stock and was an owner of Motive common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

37.     Motive's Board of Directors is currently composed of six (6) directors – Scott Harmon, Virginia Gambale, Michael J. Maples, Sr., Tom Meredith, David Sikora, and Harvey White.  All of the Directors have been named as Defendants herein.

38.     Defendant Harmon has served on the Board of Directors since June 1997. He has been the Company's CEO since its inception.   He also served as the Company's President from April 1997 to January 2003.   He is a co-founder of the Company.

39.     Defendant Gambale has served on the Board of Directors since July 2004.

40.     Defendant Maples has served on the Board of the Company since June 1997.

41.     Defendant Meredith has served on the Board of the Company since June 2003.

42.   Defendant Sikora has served on the Board of the Company since January 2000. From January 2000 to April 2000, he served as the Company's co-president.

43.   Defendant White has served on the Board of the Company since July 2004.

44.   As a result of the facts set forth herein, Plaintiff has not made any demand on Motive's Board of Directors to institute this action against the Individual and Director Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the additional following reasons:

a.   Director Defendants Harmon and Sikora are considered insiders because of their current and past positions with the Company. As such, demand on Director Defendants Harmon and Sikora is futile;

b.   Defendant Director Harmon is a co-founder of the Company. As such, demand on Director Defendant Harmon is futile;

c.   Director Defendant Sikora co-founded Question Technologies, an internet relationship management software company. Sikora was Question Technologies' Chairman and Chief Executive Officer until it was acquired by Motive in November 2001. Sikora was also the President and Chief Executive Officer of Ventix Systems, and enterprise software company, until Ventix was acquired by Motive in January 2000.

d.   A majority of Motive's Board of Directors and senior management participated in the wrongs complained of herein. Motive's directors are not disinterested or independent due to the following: Director Defendants served on the Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the Director Defendants breached the fiduciary duties that they owed to Motive and its shareholders in that they failed to prevent and correct material misrepresentations made by the Company. Further, the Director Defendants are not independent because of their stake in the financial performance of the Company;

e.   Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

f.   The Director Defendants of Motive, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Motive's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

g.   In order to bring this suit, a majority of the Directors of Motive would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

h.   The acts complained of constitute violations of the fiduciary duties owed by Motive's officers and directors and these acts are incapable of ratification;

i.   Any suit by the current directors of Motive to remedy these wrongs would likely expose the Individual and Director Defendants, and Motive, to additional liability for violations of the securities laws that would result in civil actions being filed against the Individual and Director Defendants. Harmon is presently a Defendant in securities class action lawsuits; thus, he is hopelessly conflicted in making any supposedly independent determination whether to sue himself;

j.   Motive has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Motive any part of the damages Motive suffered and will suffer thereby;

k.   If the current Directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual and Director Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

l.   If Motive's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Motive. However, due to certain changes in the language of

directors' and officers' liability insurance policies in the past few years, it is believed that the directors' and officers' liability insurance policies covering the Individual and Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by Motive against these Director Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Motive, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Motive to sue them, since they will face a large uninsured liability.

45.     Plaintiff has not made any demand on the shareholders of Motive to institute this action since demand would be a futile and useless act for the following reasons:

a.     Motive is a publicly held company with approximately 26.28 million shares outstanding, and thousands of shareholders;

b.     Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c.     Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

46.     Motive has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

a.     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

b.     Costs and legal fees for defending Motive and the Individual Director Defendants against private class action litigation arising from illegal and improper conduct alleged herein.

## FIRST CAUSE OF ACTION

### Against Individual Defendants
### for Breach of Fiduciary Duty

47.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

48.     The Individual Defendants owed and owe Motive fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Motive the highest obligation of good faith, fair dealing, loyalty and due care.

49.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

50.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

51.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Motive has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

52.     Plaintiff, on behalf of Motive, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

53.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

54.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Motive, for which they are legally responsible.

55.     As a direct and proximate result of the Individual Defendants' abuse of control, Motive has sustained significant damages.

56.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

57.     Plaintiff, on behalf of Motive, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

### Against The Individual Defendants
### for Gross Mismanagement

58.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

59.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Motive in a manner consistent with the operations of a publicly held corporation.

60.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Motive has sustained significant damages in excess of millions of dollars.

61.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

62.     Plaintiff, on behalf of Motive, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

**Against The Individual Defendants**
**for Waste of Corporate Assets**

63.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

64.     As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Motive to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

65.     As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

66.     Plaintiff, on behalf of Motive, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

**Against The Director Defendants**
**for Unjust Enrichment**

67.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

68.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Motive.

69.     Plaintiff, as shareholder and representative of Motive, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## SIXTH CAUSE OF ACTION

### Against Defendant Harmon for
### Breach of Fiduciary Duties, for Insider Selling
### and for Misappropriation of Information

70.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

71.     At the time of the stock sales set forth herein by Defendant Harmon, he knew the information described above and sold Motive common stock on the basis of such information.

72.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendant Harmon used for his own benefit when they sold Motive common stock.

73.     Defendant Harmon's sale of Motive common stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

74.     Since the use of the Company's proprietary information for his own gain constitutes a breach of Defendant Harmon's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits he obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.     Awarding to Motive restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: January 5, 2006              Respectfully Submitted,

Dell James
State Bar No. 24002342
Christopher J. Cafiero
State Bar No. 24031784
Carmody & James, P.C.
2805 North Dallas Parkway, Suite 600

Plano, TX 75093
(972) 312-1230

Brian M. Felgoise, Esquire
Law Offices of Brian M. Felgoise, P.C.
261 Old York Road, P.O. Box 706
Jenkintown, PA  19046
(215) 886-1900

Attorneys for Plaintiff

## VERIFICATION

I, ___GLENN ADAIR___ declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Motive, Inc. [NASDAQNM: MOTV], and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

___12/3/05___
Date

_____
(Client Signature)